IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INGRID CRAWFORD SMITH, an individual and successor in interest to decedent AUGUSTUS JOSHUA CRAWFORD, et al., | § § § § § § | CIVIL ACTION NO. H-18-307-LHR-CDB |
| Plaintiffs, | § § | |
| v. | § § | Consolidated with: |
| WARREN MARTIN, et al., | § § § | CIVIL ACTION NO. H-18-1526-DAD-JLT |
| Defendants. | § § | |

**MEMORANDUM AND OPINION**

This case is one of far too many involving law enforcement shootings of civilians who turn out to be unarmed. Officers of the Bakersfield Police Department initiated a traffic stop on Augustus Joshua Crawford. Mr. Crawford jumped out of the vehicle and fled on foot. Two officers pursued. One officer yelled "Oh shit, shoot him!" The other officer shot Mr. Crawford three times in the back. Mr. Crawford fell to the ground, and the officers approached. When Mr. Crawford failed to respond to the officers' commands to spread his arms, one of the officers fired six more rounds at Mr. Crawford, killing him. Mr. Crawford's mother and two minor children filed this action in their individual capacities and as successors in interest. The defendants have moved for partial summary judgment. For the reasons set out below, the motion is granted.

I. **Background**

A. **The Shooting**

On November 4, 2017, Bakersfield Police Department officers stopped a car that they believed was carrying Augustus Joshua Crawford, a suspect in a shooting that had taken place

earlier that evening. (Docket Entry No. 110 at 16). The car came to a "slow roll" without fully stopping. (*Id.*). Mr. Crawford jumped out from the passenger door side and ran toward a nearby apartment complex. (*Id.*).

Officer Warren Martin got out of the patrol vehicle to begin chasing Mr. Crawford, but his partner, Officer Adam Garcia, told him to get back into the vehicle. (*Id.*). Officers Martin and Garcia then pursued Mr. Crawford in their vehicle, following him into the apartment complex parking lot. (*Id.*). They found him standing on a dumpster. (*Id.* at 10, 38). When the officers got within 12 feet of Mr. Crawford, they got out of the vehicle and yelled "stop—police!" (*Id.* at 10, 16). Mr. Crawford then jumped over a 6-foot concrete wall separating the parking lot from a dirt field. (*Id.* at 10, 16). Officer Garcia yelled "Oh shit, shoot him!," and also jumped over the wall. (*Id.* at 38). Mr. Crawford ran through the dirt field away from Officer Garcia, using his right hand to hold up the waistband of his pants. (*Id.* at 41). Officer Martin, still in the parking lot, fired three shots at Mr. Crawford over the wall.[1] (*Id.* at 10, 42–45). Mr. Crawford fell face down, with his left hand by his head and his right arm by his right leg. (*Id.* at 45–46).

Officer Martin jumped over the wall and approached Mr. Crawford, shouting "A.J., put your arms out!"[2] (*Id.* at 11, 46). Mr. Crawford, still lying on the ground face down, responded "I can't. Why did you shoot me?" (*Id.* at 11). Mr. Crawford then moved his right hand to underneath his torso, prompting Officer Martin to again shout "A.J., put your hands out! I need to see both your hands!" (*Id.* at 11). Officer Garcia, who was standing nearby with his firearm aimed at Mr. Crawford, shouted similar commands. (*Id.* at 16). Mr. Crawford began to move his legs "from

---

[1] According to a Bakersfield Police Department general offense report, Officer Martin was able to shoot Mr. Crawford even though a 6-foot wall separated them because "Officer Martin's muzzle [wa]s about 6'6" above ground level on the west side of the wall." (Docket Entry No. 110 at 10).

[2] Mr. Crawford went by "A.J."

side to side and continued to move his hand." (*Id.* at 11). Officer Martin pointed his flashlight on Mr. Crawford and commanded, "A.J., if you have a weapon, don't grab it." (*Id.*). Officer Martin again ordered Mr. Crawford to put his hands out "or you're going to get shot again if you keep doing that." (*Id.*). Mr. Crawford responded, "I didn't do anything." (*Id.*). Mr. Crawford then turned his head toward the officers and quickly rolled onto his left side, keeping his right hand near his waistband. (*Id.*). Officer Martin shot Mr. Crawford six times from a range of five yards. (*Id.* at 47–48).

Mr. Crawford was handcuffed, searched for weapons, given on-site medical aid, then taken to a hospital. (*Id.* at 17, 21, 48). He died there of multiple gunshot wounds. (*Id.* at 21). No weapons were found on Mr. Crawford's person, but a loaded Glock handgun was recovered from the backyard of a home near the dirt field where he was shot. (Docket Entry No. 109-2 at 10). A DNA test performed on the Glock, its magazine, and the ammunition inside the magazine, excluded Mr. Crawford as a possible DNA contributor. (Docket Entry No. 110 at 79–80).

**B.    The Procedural History**

In November 2018, Mr. Crawford's mother, Ingrid Crawford Smith, and minor son, A.C.— by and through his guardian ad litem Tyshika Williams—sued in the United States District Court for the Eastern District of California, both individually and as successors in interest to Mr. Crawford. (Docket Entry No. 105-2 at 3). The plaintiffs asserted causes of action for: (1) wrongful death; (2) excessive force in violation of the Fourth Amendment to the United States Constitution, 42 U.S.C. § 1983; (3) violation of their substantive due process rights under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; (4) violation of California Civil Code §§ 42 and 52.1; (5) violation of Article 1, § 13 of the California Constitution; and (6) assault and battery. (*Id.*). They initially sued the City of Bakersfield, the Bakersfield Police Department,

Kern County, Bakersfield Police Chief Lyle Martin in his individual and official capacities, Officer Warren Martin in his individual and official capacities, and ten unidentified employees of either Kern County or the City of Bakersfield (the "Doe Defendants"). In March 2021, Judge Dale A. Drozd granted the defendants' motion to dismiss in part, dismissing the claims against the Bakersfield Police Department, Chief Lyle Martin, and Officer Warren Martin in his official capacity. (Docket Entry No. 80). Ms. Smith and A.C. voluntarily dismissed their claims under Section 13 of the California Constitution. (*Id.* at 10).

In September 2019, Mr. Crawford's minor daughter, A.J.C.—by and through her guardian ad litem Bryshanique Allen, filed a separate complaint in the Eastern District of California based on the same events. (Docket Entry No. 105-2 at 3). A.J.C. alleged causes of action for: (1) wrongful death; (2) excessive force in violation of the Fourth Amendment to the United States Constitution, 42 U.S.C. § 1983; and (3) assault and battery. (*Id.*). A.J.C. brings these claims individually and as successor in interest to Mr. Crawford. (*Id.* at 4).

In January 2020, the separate cases were consolidated. (Docket Entry No. 65). In June 2022, the defendants moved for partial summary judgment. (Docket Entry No. 105). The plaintiffs responded, (Docket Entry No. 109), and the defendants replied, (Docket Entry No. 113).

In February 2024, the case was assigned to this court, which is temporarily performing judicial duties in the United States District Court for the Eastern District of California to ease the backlog in that overburdened district. (Docket Entry No. 124).

In March 2024, the court heard argument on the motion for partial summary judgment. (Docket Entry No. 127). Based on the record, motion, response, reply, oral argument, and applicable law, the motion is granted. The reasons are set out below.

**II.     The Rule 56 Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).  If the moving party meets its burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  *Galen*, 477 F.3d at 658.  The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007).

**III.    Analysis**

The defendants make four arguments in support of their motion for partial summary judgment.  First, they argue that Ms. Smith lacks standing to assert claims other than her Fourteenth Amendment claim under 42 U.S.C. § 1983.  Second, they argue that the plaintiffs have failed to raise a genuine factual dispute material to determining whether municipal liability is precluded under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Third, they argue that A.J.C.'s claim for punitive damages is barred by the California Government Code § 818.  Fourth, they argue that the claims against the Doe Defendants should be dismissed because the plaintiffs have failed to timely amend their complaint to identify any of those defendants.

Each argument is separately analyzed.

### A. Standing

#### 1. The Wrongful Death Claim

Section 377.60 of the California Code of Civil Procedure governs standing to bring a cause of action for wrongful death. *See Jackson v. Fitzgibbons*, 127 Cal. App. 4th 329, 335 (2005). A wrongful death action allows the decedent's dependents to "pursue claims for personal injuries they have suffered as a result of a wrongful death." *Davis v. Bender Shipbuilding and Repair Co., Inc.*, 27 F.3d 426, 429 (9th Cir. 1994). Section 377.60 provides that: "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

> (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. If the parents of the decedent would be entitled to bring an action under this subdivision, and the parents are deceased, then the legal guardians of the decedent, if any, may bring an action under this subdivision as if they were the decedent's parents.
>
> (b)(1) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, parents, or the legal guardians of the decedent if the parents are deceased.
>
> . . .
>
> (c) A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support.

The plaintiffs argue that Ms. Smith has standing under § 377.60(b)(1) because she was "dependent" on her son, Mr. Crawford. (Docket Entry No. 109 at 15–16). In support, the plaintiffs rely on the following response Ms. Smith made to the defendants' request for interrogatories:

> **INTERROGATORY NO. 22:**
>
> Please state the amount, form, and means by which YOU received financial support from the DECEDENT in the last five years preceding the INCIDENT.

6

**SUPPLEMENTAL RESPONSE:**

> . . . Responding party would receive financial support from Decedent. To the extent that Responding party recalls, approximately $100.00 per month. Decedent would provide in the form of purchasing groceries, household necessities, gifts, jewelry, and trinkets for Responding party. Responding party is unaware of the means used by Decedent.

(*Id.* at 16–17).

California courts have held that a parent is not "dependent" under § 377.60(b)(1) unless the parent was, "at the time of a child's death, [] actually dependent, to some extent, upon the decedent for the necessaries of life." *Hazelwood v. Hazelwood*, 57 Cal. App. 3d 693, 698 (1976). Using this definition, the *Hazelwood* court affirmed the trial court's finding that parents who "reli[ed] upon decedent for comfort and affection and for support and pecuniary advantages to which they might be entitled in the future" did not have standing under § 377.60(b)(1). *Id.* at 697.

The Fifth District Court of Appeals concurred with the *Hazelwood* standard in *Perry v. Medina*, 192 Cal. App. 3d 603, 610 (1987), elaborating as follows:

> [A] parent cannot claim they are dependent within the meaning of Code of Civil Procedure section 377 if they receive financial support from their children which merely makes [] available to them some of the niceties of life they might not otherwise be able to afford. But, if a parent receives financial support from their child which aids them in obtaining the things, such as shelter, clothing, food and medical treatment, which one cannot and should not do without, the parent is dependent upon their child. The death of that child in this type of situation results in a distinct pecuniary loss to the parent which requires the parent to find aid elsewhere for the basic things we all need.

*Id.* The *Perry* court found a factual dispute as to whether the decedent's mother met the standard for a "dependent" because she: "lived on a meager $400 a month"; her son "brought her $100 worth of groceries a month" and contributed $100 in rent while he lived with her; and, after he moved out, he continued giving her "$50 a month in addition to the groceries." *Id.*

In *Chavez v. Carpenter*, 91 Cal. App. 4th 1433 (2001), the Sixth District Court of Appeals found a factual dispute as to whether the decedent's parents were his dependents for the necessities

of life.  The evidence showed that the decedent paid his parents an average of $100 each week to help them "defray the cost of housing and utilities."  *Id.* at 1447.  He also: "regularly provided groceries and grocery money"; helped his parents maintain their home and automobiles; and helped them purchase and finance a vehicle.  *Id.*  The court recognized this as "evidence that appellants routinely relied on decedent for money to defray their ordinary living expenses, and for help with their cars, land, and business."  *Id.*  The court held that this evidence "supports an inference that [the parents] relied on [the son]'s contributions for necessities . . . and received financial support from their child which aided them in obtaining shelter, clothing, [and] food."  *Id.* (cleaned up).

By contrast, in *Estate of Smith v. Holslag*, 2020 WL 7863428, at *12 (S.D. Cal. 2020), the decedent's mother argued that she had been dependent on her son because, when he stayed with her, he would give her "money for groceries and medicine."  The mother admitted that she had not received "regular financial assistance" from her son and that her son "did not send her money when he was not staying with her."  *Id.*  The court held that this evidence failed to raise a factual dispute as to whether the mother had been financially dependent on the son for the necessities of life.  *Id.*

Based on this case law, the court finds that Ms. Smith's interrogatory answer fails to raise a factual dispute material to determining whether she was dependent on her son for the necessaries of life.  Ms. Smith stated that Mr. Crawford purchased some groceries and household necessities—which are "necessaries of life" relevant to the standing inquiry—as well as "gifts, jewelry, and trinkets"—which are "niceties of life" not relevant to the standing inquiry.  Ms. Smith stated that Mr. Crawford's gifts had an average monthly value of $100.  However, there is no evidence in the record showing what proportion of Mr. Crawford's gifts were necessaries as opposed to niceties.  And, unlike in *Perry*, there is no evidence of Ms. Smith's monthly income and expenses, so there

is no way to determine to what degree, if any, Ms. Smith depended on her son's contributions. Further, the value of Mr. Crawford's $100 per month contributions is significantly less than the $100 per week contributions in *Chavez*.

Ms. Smith's deposition testimony sheds light on the nature of what Mr. Crawford had provided her. When asked whether Mr. Crawford "g[a]ve you any money or rent or support at all," Ms. Smith responded:

> He gave money to his father. He bought me a few — whatever I asked for, you know, 'I'm going to the store. Is there something you need?' He would bring me what I needed, but direct money, no, I didn't need it. I just was glad he got gainful employment.

(Docket Entry No. 105-4 at 9).

Occasional gifts and purchases of a few grocery items for the mother when the son went to the store is not the kind of "routine[]" financial support that gives rise to a finding of actual dependency. *See Chavez*, 91 Cal. App. 4th at 1447; *Holslag*, 2020 WL 7863428, at *12.

Summary judgment is appropriate on Ms. Smith's wrongful death claim.

## 2. The Survival Claim

A survival action allows "a decedent's estate [to] recover damages on behalf of the decedent for injuries that the decedent has sustained." *Davis*, 27 F.3d at 429. "[T]he survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim [under 42 U.S.C. § 1983] on that individual's behalf if the relevant state's law authorizes a survival action." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013). "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Id.*

California Code of Civil Procedure § 377.30 sets out the standing requirements to bring a survival action.  *Id.* at 1229.  It provides:

> A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . , and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest.

CAL. CODE. OF CIV. P. § 377.30.  A survival action can be asserted only by the decedent's personal representative or successor in interest.  *F.C., III v. Cnty. of Los Angeles*, 2011 WL 13127347, at *4 (C.D. Cal. Sept. 13, 2011).  A decedent's successor in interest is "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action."  CAL. CODE OF CIV. P. § 377.11.  When a person dies intestate, a person is a beneficiary of the decedent's estate if that person would inherit under Sections 6401 and 6402 of the California Probate Code.  *Id.* § 377.10(b).  Section 6401 applies if the decedent is survived by a spouse; § 6402 applies if there is no surviving spouse.

Ms. Smith lacks standing to bring a survival action on Mr. Crawford's behalf because she is neither the personal representative of Mr. Crawford's estate nor a successor in interest.  She is not a beneficiary of Mr. Crawford's estate because under § 6402, which governs intestate succession, the estate passes to Mr. Crawford's surviving issue, A.C. and A.J.C., not to his parents.  § 6402(a).  Ms. Smith argues that she is an "other successor in interest who succeeds to a cause of action" under § 377.11, but she provides no support for this bare legal conclusion.  (Docket Entry No. 109 at 18).

Summary judgment is appropriate on Ms. Smith's survival claims.

B.  **Municipal Liability**

The plaintiffs assert that the City of Bakersfield is liable because: (1) it ratified the constitutional violations of Officer Martin; (2) it failed to adequately train its officers; and (3) its use-of-force policies and practices were constitutionally deficient.

"A municipality cannot be held liable under a respondeat superior theory." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) (citing *Monell*, 436 U.S. at 691). Municipal liability depends on an official policy or custom that caused a constitutional violation. *Id.* A "policy" is "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir.2002) (per curiam) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)) (cleaned up).

1.  **Ratification**

A municipality can be liable under § 1983 when an official with final policymaking authority ratifies a subordinate officer's "unconstitutional decision or action and the basis for it." *Clouthier v. Cnty. of Santa Clara*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) (quotation marks and quoting reference omitted). The final policymaker "must make a deliberate choice to endorse the subordinate's actions in order for the municipality to be liable." *Gonzalez v. Cnty. of Merced*, 289 F. Supp. 3d 1094, 1115 (E.D. Cal. 2017) (citing *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015)). "The policymaker must have knowledge of the constitutional violation and actually approve of it." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). A "mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Id.*

11

The plaintiffs argue that the Bakersfield Police Department ratified Officer Martin's alleged excessive use of force that led to Mr. Crawford's death. (Docket Entry No. 109 at 19–20). The plaintiffs allege that Officer Martin's supervisor, Sergeant Chris Knutson, ratified the use of force because he was supervising Officer Martin and giving him "directives" over the police radio on November 4, 2017. (*Id.* at 20). The plaintiffs assert that Sergeant Knutson "provided Officer Martin with information that Mr. Crawford was allegedly armed, failed to call for additional resources or set up a containment perimeter to avoid placing his officers in danger," and "did not direct Officer Martin to use an alternative tactical option or to coordinate a tactical arrest plan to subdue the suspect." (*Id.* at 20–21). The plaintiffs note that Officer Martin had been receiving radio transmissions from the Bakersfield Police Department that day. (*Id.*). Finally, the plaintiffs argue that Officer Garcia gave an unconstitutional directive by telling Officer Martin, "Oh shit, shoot him!" (*Id.* at 20).

The plaintiffs have failed to submit or point to summary judgment evidence raising a genuine factual dispute material to determining whether a final policymaker ratified Officer Martin's use of force. There is no evidence that either Sergeant Knutson or Officer Garcia had final policymaking authority for the City of Bakersfield. And even if there were facts showing that Sergeant Knutson had final policymaking authority, he was not present at the scene, and there is no evidence that he had knowledge of a constitutional violation and deliberately and actually approved it.

  **2. Failure to Train**

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cnty. of Los Angeles*,

442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 377, 388 (1989)). To demonstrate a municipality's deliberate indifference to an inadequate training program, a plaintiff usually must show a pattern of similar constitutional violations caused by inadequate training. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where 'a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

The plaintiffs argue that the Bakersfield Police Department failed to train its officers on "de-escalation tactics and to consider an individual's inability to comply with officers' commands." (Docket Entry No. 109 at 25). The plaintiffs do not attempt to show a pattern of similar constitutional violations caused by the Bakersfield Police Department's allegedly inadequate training on de-escalation or how to handle a situation in which a suspect is unable to respond to police commands. Instead, the plaintiffs argue that the excessive use of deadly force, like the shooting that killed Mr. Crawford, was a highly predictable consequence of the Department's inadequate training. (*Id.*).

The plaintiffs' argument fails because they do not allege specifics about what was deficient in the Department's training of its officers. Rather, the plaintiffs rely on the report of their expert to explain that Officer Martin and Officer Garcia allegedly made erroneous "tactical deployment and engagement decisions" during their pursuit of Mr. Crawford. (*Id.* at 25–26). That evidence is probative of whether the individual officers used excessive force in their pursuit and

13

apprehension of Mr. Crawford. But that evidence does not raise a factual dispute material to determining whether the Department failed to train its officers to a degree or in a manner that reflects deliberate indifference to the rights of the public.

### 3. The Use of Force Policy

To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (quotation marks and quoting reference omitted) (cleaned up). "[A] county's lack of affirmative policies or procedures to guide employees can amount to deliberate indifference, even when the county has other general policies in place." *Long*, 442 F.3d at 1189.

A policy may amount to deliberate indifference when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Castro*, 833 F.3d at 1076 (quoting *City of Canton*, 489 U.S. at 392). This requirement is satisfied when the plaintiff establishes "that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* (quoting *City of Canton*, 489 U.S. at 396). "For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury. The plaintiff's burden is to establish that the injury would have been avoided had proper policies been

14

implemented." *Long*, 442 F.3d at 1190 (quotation marks and quoting reference omitted) (cleaned up).

The plaintiffs argue that the City of Bakersfield "had an official policy regarding the use of excessive force, which omitted alternative tactics and consideration for an individual's ability to comply with commands." (Docket Entry No. 109 at 22). The plaintiffs refer to the Bakersfield Police Department's Use of Force Policy that was in effect in November 2017. They argue that the policy was constitutionally deficient because it "failed to include guidelines such as alternative tactics, including de-escalation that misled officers into believing their use of force was justified. Furthermore . . . [the Policy] did not include guidelines pursuant to Penal Code Section 835(a), requiring officers to consider an individual's apparent ability to understand and comply with officer commands prior to using excessive force." (*Id.* at 23). The plaintiffs also rely on the Department's 2021 Use of Force Policy, which they claim corrected certain deficiencies in the 2017 Policy, as evidence that the 2017 Policy was constitutionally deficient. (*Id.*).

The Use of Force Policy used by the Bakersfield Police Department in November 2017 was developed by Lexipol, a company that develops state-specific policies for public safety agencies. (Docket Entry No. 105-5 at 2). "[M]any law enforcement agencies in California utilize Lexipol in developing their policies." *Hepner v. Cnty. of Tulare*, No. 118CV00774NODJEPGPC, 2024 WL 922891, at *5 (E.D. Cal. Mar. 1, 2024); (Docket Entry No. 105-5 at 2). The 2017 Policy, also called "Policy 300," provided in relevant part that:

> Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.
>
> The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular

15

situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

. . .

Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance.

. . .

When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a) Immediacy and severity of the threat to officers or others.

(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d) The effects of drugs or alcohol.

(e) Subject's mental state or capacity.

(f) Proximity of weapons or dangerous improvised devices.

(g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h) The availability of other options and their possible effectiveness.

(i) Seriousness of the suspected offense or reason for contact with the individual.

(j) Training and experience of the officer.

(k) Potential for injury to officers, suspects and others.

(l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m) The risk and reasonably foreseeable consequences of escape.

(n) The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

>   (p) Prior contacts with the subject or awareness of any propensity for violence.
>
>   (q) Any other exigent circumstances.

(Docket Entry No. 110 at 52–54).

The Use of Force Policy that the Department adopted in 2021 added an additional factor for officers to consider in determining the reasonableness of force: "The individual's apparent ability to understand and comply with officer commands." (Docket Entry No. 110 at 57). It also added a section entitled "ALTERNATIVE TACTICS – DE-ESCALATION":

> As time and circumstances reasonably permit, and when community and officer safety would not be compromised, officers should consider actions that may increase officer safety and may decrease the need for using force:
>
>   (a) Summoning additional resources that are able to respond in a reasonably timely manner.
>
>   (b) Formulating a plan with responding officers before entering an unstable situation that does not reasonably appear to require immediate intervention.
>
>   (c) Employing other tactics that do not unreasonably increase officer jeopardy.
>
> In addition, when reasonable, officers should evaluate the totality of circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force (Government Code § 7286(b)). Such alternatives may include but are not limited to:
>
>   (a) Attempts to de-escalate a situation.
>
>   (b) If reasonably available, the use of crisis intervention techniques by properly trained personnel.

(*Id.* at 58–59).

The plaintiffs have failed to raise a genuine factual dispute material to determining whether the 2017 Use of Force Policy, by failing to include the additions of the 2021 Policy, amounted to deliberate indifference. The 2017 Policy directed officers to consider, among other things, "(b) [t]he conduct of the individual being confronted, as reasonably perceived by the officer at the

time"; "(e) [the] [s]ubject's mental state or capacity"; and "(h) [t]he availability of other options and their possible effectiveness." The 2021 addition of "[t]he individual's apparent ability to understand and comply with officer commands" was implicitly encompassed in factors (b) and (e) in the 2017 Policy. And the 2021 addition on de-escalation tactics was implicitly encompassed in factor (h) in the 2017 Policy. Further, the 2017 Policy made clear that the use of force was a last resort, stating that force shall be used only as "reasonably appears necessary" and that "the ultimate objective of every law enforcement encounter is to avoid or minimize injury." (Docket Entry No. 110 at 52–53).

The 2017 Policy, by failing to explicitly include the 2021 additions, was not "so likely to result in the violation of constitutional rights[] that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Castro*, 833 F.3d at 1076. The Eastern District of California, in *Hepner v. County of Tulare*, recently rejected the argument that Lexipol Policy 300—the same Lexipol policy used by the Bakersfield Police Department here—amounted to deliberate indifference because it failed to "explicitly comment on or breakdown the County Defendants' de-escalation policies." 2024 WL 922891, at *5; *see also Gonzalez v. City of Tustin*, No. 823CV01274FWSADS, 2023 WL 9689159, at *6 (C.D. Cal. Dec. 28, 2023) (rejecting a *Monell* claim based on the failure to develop a de-escalation policy).

The plaintiffs have not produced or pointed to evidence of other constitutional violations resulting from the alleged deficiencies of the 2017 Policy. Their assertion that "the omissions in the 2017 use of force policy as opposed to that of 2021 . . . surely has caused more than one incident of Constitutional violations" is conclusory. (Docket Entry No. 109 at 21–22). Because the 2017 Policy is not facially unconstitutional, the City cannot be held liable based on a single incident. *See Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 618 (9th Cir. 2014) ("[P]roof of a single incident

of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . .").

Summary judgment is appropriate on the plaintiffs' *Monell* claims.

### C. Punitive Damages

The defendants argue that A.J.C.'s claim for punitive damages is barred by California Government Code § 818 because "the sole defendant sued by A.J.C. is the City of Bakersfield, against whom no punitive damages can be awarded." (Docket Entry No. 105-1 at 29). The plaintiffs do not dispute that § 818 precludes punitive damages against the City. Instead, they request leave to amend A.J.C.'s complaint to add Officer Martin as a defendant. (Docket Entry No. 109 at 26). They argue that good cause supports the request because A.J.C.'s complaint was filed after the other plaintiffs' complaint—since he was born after Mr. Crawford died—and the failure to include Officer Martin as a defendant was an "oversight." (*Id.*).

A.J.C.'s complaint was filed in September 2019. (Docket Entry No. 105-2 at 3). The deadline to amend pleadings was August 13, 2021. (Docket Entry No. 87). The plaintiffs do not provide any reason, besides "oversight," for failing to add Officer Martin as a defendant before the deadline. The plaintiffs did not exercise due diligence; leave to amend is denied. *See Kamal v. Eden Creamery, LLC*, 88 F.4th 1268, 1277 (9th Cir. 2023) ("The good cause standard primarily considers the diligence of the party seeking the amendment. . . . [I]f that party was not diligent, the inquiry should end.") (quotation marks and quoting references omitted).

Summary judgment is granted on A.J.C.'s punitive damages claim.

### D. The Doe Defendants

The defendants argue that the Doe Defendants should be dismissed because the plaintiffs did not amend their complaint to add the identities of the Doe Defendants before the pleading

amendment deadline. (Docket Entry No. 105-1 at 30). The plaintiffs respond that the "Defendants failed to meet and confer as to the issue of the DOE Defendants and only raise the specific request now after Plaintiff advised that they would be seeking to DOE in Officer Martin as a Defendant in the lawsuit brought by A.J.C." (Docket Entry No. 109 at 27).

For the reasons explained above, A.J.C. is not granted leave to file an amended complaint. Further, the addition of another set of defendants would unduly delay trial of this five-year-old case. The Doe Defendants are dismissed.

**IV.     Conclusion**

The defendants' motion for partial summary judgment is granted. (Docket Entry No. 105). The parties are ordered to confer on a scheduling order to resolve the remaining issues.

SIGNED on April 1, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge